**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:16-cr-158-DBH |
| v. | ) | |
| | ) | |
| ROBERT ZUSCHLAG | ) | |
| KRISTEN ZUSCHLAG | ) | |

## GOVERNMENT'S VERSION OF THE OFFENSE

Had the case proceeded to trial, the Government would produce evidence that would establish the following facts beyond a reasonable doubt:

For all times relevant to this case, Medicaid was a health care benefit program funded with federal and state funds. It was administered by the U.S. Department of Health and Human Services and by state agencies. In Maine, Medicaid was part of MaineCare and was administered by the Maine Department of Health and Human Services.

MaineCare established a system for non-emergency transportation for eligible beneficiaries based upon a regional approach. MaineCare divided the state into several regions, or "catchment areas". MaineCare designated one or two transportation providers in each catchment area as a Full Service Transportation Provider (hereinafter, "FSTP"). It was the duty of a FSTP to provide or coordinate transportation services in accordance with the MaineCare regulations. In the Cumberland County catchment area, Regional Transportation Program, Inc. (hereinafter, "RTP") and Freeport Transit, Inc. (hereinafter "FTI") were FSTPs.

As a FSTP, FTI provided transportation services and also had the authority to refer riders to other transportation providers. Other transportation providers included friends and family, public transportation, taxis, volunteer drivers, and wheelchair van providers. MaineCare regulations required FTI to provide or arrange transportation for MaineCare members to covered

healthcare services using the least expensive manner, to MaineCare, suitable for the member's medical needs.

FTI could refer a MaineCare member to a "wheelchair van provider" only if the member was non-ambulatory and unable to ride in a conventional vehicle and all FSTPs in the region were unable to provide the service due to the unavailability of agency vehicles or because the member could not be safely transported on an agency vehicle.

The reimbursement rate for wheelchair van services performed by a wheelchair van provider generally were higher than the other modes of non-emergency transportation. MaineCare regulations prohibited FTI from being a wheelchair van service provider. In addition, a wheelchair van service provider could not transport a MaineCare member unless it received a referral from an FSTP. MaineCare regulations required the wheelchair van provider to maintain documentation from each FSTP approving the services.

To receive reimbursement from MaineCare, a provider was required to submit a claim to MaineCare, either on paper or electronically, using billing codes that MaineCare authorized each provider to use. MaineCare also required the provider to retain records justifying the service billed for a certain period of time.

In approximately July 2009, an auditor with the MaineCare Program Integrity Unit (hereinafter, "PIU")[1], conducted a routine audit of Mainecare transportation providers and discovered FTI had been using a particular billing code that MaineCare alleged FTI should not have used. The auditor issued a recoupment letter demanding repayment of $283,110.52 which

---

[1] Program Integrity (PI) is responsible for monitoring and safeguarding the MaineCare Program against fraud, abuse and waste. It conducts analysis of MaineCare billings to detect utilization patterns or trends that may indicate fraud, abuse or waste. Based on data analysis or referrals/complaints received from other state agencies, health care providers or members, PI may perform retrospective audits/reviews of MaineCare Providers and members to validate the allegations of fraud, abuse or waste.

represented the amount of monies MaineCare was overbilled because of FTI's use of the billing code. FTI opposed that recoupment letter claiming that in 2003, a representative of MaineCare had given them permission to use the code. MaineCare investigated this claim but ultimately MaineCare sent a letter dated November 9, 2009 notifying FTI it was upholding its decision to seek the recoupment of the $283,110.52. FTI requested an administrative hearing on Mainecare's decision.

Within weeks after the Zuschlags learned that MaineCare was not accepting their explanation for the use of the billing code, C3 Transport was started. Kristen Zuschlag admitted in an interview with investigators in July 2013 that C3 was formed because Maine told FTI it could no longer bill using the contested code. Records from the Maine Secretary of State show C3 filed Articles of Organization on December 16, 2009.

On about December 16, 2009, Kristen Zuschlag submitted an enrollment application for C3 Transport to become a MaineCare wheelchair van provider. The application contained several material false statements, including that Ms. Zuschlag representing she was the sole owner, and had been in business since January 2009 and that her business address was in Gray, Maine.

MaineCare required a wheelchair van applicant to also submit a letter with its application from a FSTP indicating the FSTP would use the services of the wheelchair van provider. With C3's application, Ms. Zuschlag provided such a letter for C3 from RTP that was obtained using false pretenses. Someone posing as Deb Ceranic (Robert Zuschlag's sister) contacted RTP by telephone and requested the letter on behalf of C3 – Ms. Ceranic would testify she never contacted RTP and that she did not have any involvement with C3. MaineCare reviewed the application and letter in late December and approved the application in early January 2010, enrolling C3 as a provider effective as of December 1, 2009. MaineCare would not have

approved the application if MaineCare knew of the falsities in the application and if C3 had not obtained the letter from a FSTP.

The evidence will show that from C3's creation, C3 and FTI operated as one company in violation of MaineCare's regulation prohibiting a FSTP from being a wheelchair van provider. C3 and FTI operated out of the same location in Freeport, Maine, shared operating expenses, used the same employees, and utilized the same professional service providers (i.e. accountant, insurers, payroll company). The evidence will show that the only vans C3 used at the outset were four (4) vans that C3 allegedly leased from FTI. Further, FTI covered all of C3's expenses through at least early January and lent C3 the monies C3 used to open its bank account. The evidence will show that Robert Zuschlag managed both FTI and C3 on a regular basis and that Robert Zuschlag was involved in all facets of C3's operation including the purchase and disposition of C3's assets and was the person who had almost exclusive dealings with the professionals who provided services to C3. The evidence would further show that the Zuschlags lived in Georgia from approximately 2007 and that the employees of FTI/C3 would testify almost all of their dealings for FTI and/or C3 on a regular basis were with Robert Zuschlag and that they had little to no interaction with Kristen Zuschlag.

The evidence will also show that FTI/C3 operated in violation of the MaineCare requirement that rides be arranged in the least expensive way. Robert Zuschlag directed that rides be arranged and provided to maximize profits for FTI/C3. Most of the riders who had been transported on FTI and were billed using the contested code were referred by FTI to C3. Almost all of C3's referrals came from FTI and over 90-95% of wheelchair van referrals made by FTI went to C3. FTI made the referrals to C3 without making a single referral to the other FSTPs who could have made the transport or arranged the transport in a more economical mode.

**PIU Audits**

In May 2011, the PIU auditor initiated a routine audit of C3. This audit included a request for referral forms for riders and trip dates identified in the audit request. In response to this request, on about June 3, 2011, Kristen Zuschlag produced a number of referral forms and drivers logs. A review of this documentation revealed that the referral forms were all from FTI. Based upon his review of the documents produced in response to the first request, in September 2011, the auditor made a second audit request to C3. On November 15, 2011, the auditor spoke with Kristen Zuschlag who informed the auditor that she had mailed the requested documents. The auditor received the requested documents on November 16, 2011. A review of this documentation revealed that this response included referral forms purportedly from FTI and RTP. The auditor sent the referrals to RTP for confirmation but RTP stated the referral forms were not genuine and that RTP had never sent a referral to C3.

In June 2013, a criminal investigator with the Department of Health and Human Services – Office of Inspector General made an audit request to C3 that included a request for referral forms for riders and trip dates identified in the audit. In response to this request, Kristen Zuschlag produced a number of referral forms. A review of this documentation revealed that many of the referral forms were purportedly from RTP. Further review of the forms revealed that some of the forms had original writing on the forms even though the forms purportedly had been received by C3 from RTP via fax. RTP again confirmed RTP had never sent a referral to C3.

**Taxes**

A review of the tax returns filed by Robert and Kristen Zuschlag revealed that for tax years 2010 through 2013, they knowingly underreported approximately $208,657.94 in income for C3 and failed to report any income from another business (Freeport Taxi). This

underreporting of income resulted in an additional tax due and owing to the Internal Revenue Service of approximately $72,501.09.

A Certified Public Accountant (CPA) prepared the Forms 1040, Individual Income Tax Returns, for Robert and Kristen Zuschlag during the relevant prosecution period. The CPA also prepared the Forms 1120S, Income Tax Returns for an S Corporation, on behalf of C3 and the returns for FTI and Z Management, another of Robert Zuschlag's business entities. The CPA prepared all the returns using information provided by Robert Zuschlag in what were known as "Dome Books". These dome books were handwritten and listed gross receipts and disbursements, along with beginning and ending bank balances. The Zuschlags did not provide any documentation supporting the figures outlined in the dome books. The CPA and Robert Zuschlag exchanged numerous emails concerning preparation of the returns. A review of the dome books compared to deposits by MaineCare into the Zuschlag's bank accounts reveal the dome books understated the revenue MaineCare paid C3. Furthermore, Robert Zuschlag never informed the CPA about the existence of another business he operated (Freeport Taxi). Therefore no corporate or partnership tax returns were ever created for the Zuschlags, nor were there ever Schedules C filed with their personal Forms 1040 reflecting revenue received by the Zuschlags for their income from Freeport Taxi.

Each of the Forms 1040 were prepared by the CPA and were electronically filed. Both Robert and Kristen signed the Form 8879, IRS e-file Signature Authorization, for tax years 2010 through 2013.

Dated: June 29, 2018

Halsey B. Frank
United States Attorney
District of Maine

/s/Daniel J. Perry
Assistant United States Attorney